KENNARD C. KOBRIN *vs.* DAVID R. GASTFRIEND.

Bristol. October 5, 2004. - January 20, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*"Anti-SLAPP" Statute. Constitutional Law,* Right to petition government. *Board of Registration in Medicine. Statute,* Construction. *Witness,* Expert.

This court concluded that the anti-SLAPP statute, G. L. c. 231, § 59H, inserted by St. 1994, c. 283, § 1 (statute), did not immunize the defendant from liability for statements the defendant made in an affidavit *as* an expert investigator and witness on behalf of the Board of Registration in Medicine (board) in underlying professional disciplinary proceedings, where the statute's legislative history revealed an intent to protect private citizens exercising their constitutional right to speak out on matters of concern to them and their communities and to seek governmental relief, and the defendant, rather than exercising his right to petition or to seek redress from the board in the proceedings, asserted nothing more than a mere contractual connection to them. [331-340] SOSMAN, J., dissenting, with whom MARSHALL, C.J., joined.

Where the plain language of G. L. c. 112, § 5, which provides qualified immunity for those who participate in board investigations of physician misconduct, applied to the defendant's statements to the board in an affidavit made in the defendant's capacity as an expert investigator and witness on behalf of the board, this court remanded a civil action for inquiry into whether the defendant's conclusions in the affidavit were made in good faith and without malice. [340-342] SOSMAN, J., dissenting, with whom MARSHALL, C.J., joined.

CIVIL ACTION commenced in the Superior Court Department on March 15, 2002.

A special motion to dismiss was heard by *Robert J. Kane,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*George C. Deptula* for the plaintiff.

*William J. Dailey, Jr.,* for the defendant.

*Thomas F. Reilly,* Attorney General, *Peter Clark & David R. Marks,* Assistant Attorneys General, *& John H. Walsh,* for the Commonwealth, amicus curiae, submitted a brief.

COWIN, J. This case has its origin in disciplinary actions brought against a psychiatrist (the plaintiff here) by the Board of Registration in Medicine (board). The defendant, also a psychiatrist, was hired by the board to assist in its investigation of the complaints. After he was exonerated by the board on all charges, the plaintiff sued the defendant for statements made in the form of an affidavit. The defendant's special motion to dismiss pursuant to G. L. c. 231, § 59H (the "anti-SLAPP" statute), was allowed by a Superior Court judge. The plaintiff appealed from the dismissal of the suit to the Appeals Court, and we transferred the case to this court on our own motion.

The question before us is whether G. L. c. 231, § 59H, immunizes the defendant physician from liability for statements made in his affidavit. We hold that, in the circumstances of this case, the defendant's activities fall beyond the scope of the anti-SLAPP statute's protections. Accordingly, we vacate the dismissal of the complaint and remand the case for further proceedings.

*Background.* The plaintiff, Kennard C. Kobrin, is a licensed psychiatrist who owned and operated a psychiatry practice in Fall River and was also a contracted mental health and substance abuse service provider with the Massachusetts Medicaid Assistance Program. The defendant, David R. Gastfriend, is a licensed psychiatrist with a subspecialty certification in addiction psychiatry and has served as a director of addiction services at Massachusetts General Hospital since 1991, where he treats patients for substance abuse and conducts research.[1]

In 1993, the State police began investigating the plaintiff's prescription practices after several of his patients died in circumstances involving the overuse of various drugs. The State police retained the defendant to assist with the criminal investigation. Meanwhile, in 1994 and 1996, three complaints were filed against the plaintiff with the board concerning his alleged improper prescription of benzodiazepines to his patients.[2] Pursuant to G. L. c. 112, § 5, the board is granted authority to

---

[1]There is a dispute as to the defendant's precise position at Massachusetts General Hospital, but it is of no import to our analysis.

[2]According to the record, benzodiazepines are narcotics used to treat anxiety and are sometimes abused by those with drug addictions.

"investigate all complaints relating to the proper practice of medicine by any person holding a certificate of registration" to practice medicine within the Commonwealth. The defendant was retained by the board under contract and was paid to assist in its investigation of these complaints and to render an expert opinion concerning the plaintiff's medical practices. See G. L. c. 112, § 5 ("the board shall hire such attorneys and investigators as are necessary").

On request of the counsel assigned to the disciplinary case (complaint counsel), the defendant reviewed and evaluated numerous medical records and reports relating to the plaintiff's prescription practices and executed an affidavit. The defendant's seven-page affidavit set forth his professional opinion that the plaintiff deviated from the proper standard of care and was "engaged pervasively in illegitimate prescribing and . . . widespread misconduct," and concluded that the plaintiff's "continued practice of medicine . . . represents a serious and immediate threat to his patients and to the public health, safety and welfare."

Relying in part on the defendant's opinions and findings as set forth in his affidavit, complaint counsel filed with the board a motion for summary suspension of the plaintiff's license pursuant to 243 Code Mass. Regs. § 1.03(11)(a) (1993). A statement of allegations was filed against the plaintiff, see 243 Code Mass. Regs. § 1.01 (1993); the board summarily suspended his registration to practice medicine and referred the matter to the division of administrative law appeals (DALA). At the DALA hearing, the defendant, who was subpoenaed by the plaintiff's attorney, testified concerning the contents of his affidavit.[3] The administrative magistrate concluded that the plaintiff did not illegally prescribe benzodiazepines or otherwise render substandard care to his patients, and the board dismissed the charges against the plaintiff.[4]

The plaintiff filed suit in the Superior Court asserting claims

[3]The plaintiff called the defendant as a witness in order to demonstrate that his affidavit was "replete with error."

[4]The DALA magistrate found the defendant's opinions to be "unfounded." We render no opinion as to the contents of the affidavit.

against the defendant for "expert witness malpractice/negligence," defamation, malicious prosecution, and interference with contractual relations. All counts are based on the defendant's preparation and submission of the affidavit to the board, "knowing the information contained therein [was] false, misleading and fraudulent and was maliciously included therein with the intention to injure" the plaintiff.[5] In response to the complaint, the defendant filed a special motion to dismiss pursuant to G. L. c. 231, § 59H, commonly referred to as the "anti-SLAPP" statute.[6] The judge allowed the motion and subsequently awarded the defendant attorney's fees.

In his appeal, the plaintiff asserts that the anti-SLAPP statute is not applicable to the defendant because the latter was not petitioning the government, but rather was providing paid assistance to the government in its case. The defendant maintains that dismissal of the suit against him pursuant to the anti-SLAPP statute was appropriate because he was engaged in "petitioning activities" before the board within the meaning of G. L. c. 231, § 59H.[7] We conclude that the defendant's activities are governed neither by the letter nor by the purpose of the anti-SLAPP statute. Because the defendant was not seeking from the government any form of redress for a grievance of his own or otherwise petitioning on his own behalf, he was not exercising his "right of petition under the constitution" within the meaning of the statute. G. L. c. 231, § 59H. We would alter considerably the Legislature's intent were we to interpret the statute so as to expand its scope to protect the statements of a disinterested paid witness.

*Discussion.* We review the Superior Court judge's decision to grant the defendant's special motion to dismiss to determine

---

[5]The defendant asserts that he was sued during the pendency of the plaintiff's criminal trial and that the suit would chill the defendant's likely participation in that trial. The record reveals that the defendant was not sued based on his involvement in the pending criminal case, but only as a result of his "act of preparing and submitting to the [b]oard . . . [his] affidavit."

[6]The acronym "SLAPP" stands for Strategic Lawsuit Against Public Participation. See *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 160 n.7 (1998).

[7]We recognize the amicus brief filed by the Attorney General on behalf of the Commonwealth supporting the defendant's position.

whether there was an abuse of discretion or other error of law. See *Baker* v. *Parsons*, 434 Mass. 543, 550 (2001); *McLarnon* v. *Jokisch*, 431 Mass. 343, 348 (2000).

1. *Applicability of the anti-SLAPP statute.* The anti-SLAPP statute, G. L. c. 231, § 59H, inserted by St. 1994, c. 283, § 1, was enacted by the Legislature to provide a quick remedy for those citizens targeted by frivolous lawsuits based on their government petitioning activities. See preamble to 1994 House Doc. No. 1520. See also *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 161-162 (1998). The statute employs a number of mechanisms to protect the rights of those providing information to the government, including a special motion to dismiss and expedited hearing on the motion, a stay of discovery proceedings pending the motion's disposition, and the award of attorney's fees and costs to successful moving parties. See G. L. c. 231, § 59H. It applies to matters of both public and private concern, *McLarnon* v. *Jokisch*, *supra* at 347; *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 164; and encompasses petitions brought before governmental agencies. See G. L. c. 231, § 59H; *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 122-123 (2002) (applying anti-SLAPP statute to one defendant's communications with Federal Deposit Insurance Corporation).

In determining whether the defendant's statements to the board fall within the scope of the anti-SLAPP statute, we apply the general rule of statutory construction that a statute is to be interpreted "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Triplett* v. *Oxford*, 439 Mass. 720, 723 (2003), quoting *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975).

Accordingly, we turn first to the language of the anti-SLAPP statute to determine the legislative intent. The statute, in pertinent part, provides:

"In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party

are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss."

G. L. c. 231, § 59H. The statute then defines a "party's exercise of its right of petition" as:

> "[A]ny written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government."

*Id.* We read the phrase "based on said party's exercise of its right of petition under the constitution" as restricting the statute's coverage to those defendants who petition the government on their own behalf. In other words, the statute is designed to protect overtures to the government by parties petitioning in their status as citizens. It is not intended to apply to those performing services for the government as contractors.[8]

"None of the words of a statute is to be regarded as superfluous, but each is to be given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the statute . . . ." *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 352 Mass. 617, 618 (1967), quoting *Bolster* v. *Commissioner of Corps. & Taxation*, 319 Mass. 81, 84-85 (1946). The statute explicitly extends protec-

---

[8]No definition of the phrase will encompass every case that falls within the statute's reach, and some difficult factual situations will have to be assessed on a case-by-case basis. What we seek to do is to limit the statute's protection, in accordance with the legislative intent, to the type of petitioning activity the Constitution envisions in which parties petition their government as citizens, not as vendors of services. See discussion *infra.*

tion to a party based on "said *party's* exercise of *its* right of petition" (emphasis added). G. L. c. 231, § 59H. Moreover, the right of petition protected in the anti-SLAPP statute is that right enumerated in the First Amendment to the United States Constitution ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a *redress of grievances*" [emphasis added]) and in art. 19 of the Massachusetts Declaration of Rights ("The people have a right . . . to request of the legislative body . . . by the way of . . . petitions . . . *redress* of the *wrongs done them*, and of the grievances *they suffer*" [emphasis added]). See G. L. c. 231, § 59H (protecting against lawsuits "based on said party's exercise of its right of petition *under the constitution* of the United States or of the commonwealth" [emphasis added]). The right of petition contemplated by the Legislature is thus one in which a party seeks some redress from the government. See Webster's Third New Int'l Dictionary 1690 (1993) (defining "petition" as "a formal written *request* addressed to an official person or organized body" and as "a formal written request addressed to a magistrate or court *praying for . . . relief*" [emphasis added]).

Here, the defendant was not exercising *his* right to petition or to seek any redress from the board (a government body), but rather was acting solely on behalf of the board as an expert investigator and witness. The Superior Court judge thus erred in concluding that the defendant's activities "f[e]ll within the letter and spirit of the petitioning activities enumerated in G. L. c. 231, § 59H."

The dissent suggests that our interpretation today departs from the literal construction of the statute and states that a broad construction of the statute more accurately reflects the statutory language. See *post* at 343-345. The dissent maintains that we need not speculate about the meaning of the language nor depart from it unless the language would produce an absurd result. See *post* at 345-346. Because the language obviously produces no absurd result here, the dissent continues, all we need consider is the statute's plain language. As the dissent interprets that statutory language, every statement ever made to a government body is protected. Unfortunately, this analysis

ignores the history that led to adoption of the statute, miscon-
strues the statutory language, and in doing so, fails to effectuate
the legislative intent.

While the dissent makes much of the fact that the Legisla-
ture's choice of words was deliberate, see *post* at 344, it
overlooks the important fact that the Legislature explicitly used
the phrase "right of petition under the constitution" in the
statute, thus expressly implicating the term's constitutional
meaning. See G. L. c. 231, § 59H. The constitutional "right of
petition" is a term of art that the Legislature did not adopt casu-
ally or accidentally. The Legislature's decision to refer to the
right of petition secured in the Federal and State Constitutions
must be accorded significance in order to effectuate the legisla-
tive intent.[9] See *id.*

Relying on a broad definition of a "party's exercise of its
right of petition," the defendant similarly argues that the judge's
determination was correct because he submitted a "written . . .
statement" to a government "body" in connection with an issue
that was "under consideration," see G. L. c. 321, § 59H, and
that nothing in the statute requires a party to commence or
initiate a proceeding himself or herself. Like the flawed analysis
in the dissent, this argument fails to account for the statute's
use of the term "right of petition under the constitution" and
the additional language indicating that it is the petitioner's *own*
interests and statements directed thereto that are the subject of
protection.

The defendant attempts to bolster his argument by pointing to
cases that acknowledge the breadth of the statute's wording.
See *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156,
162 (1998) ("the Legislature intended to enact very broad

---

[9]The dissent argues that "the statute provides us with the Legislature's defini-
tion of the entire term 'a party's exercise of its right of petition.' " *Post* at 343.
The dissent glosses over the fact that the statutory definition of "said party's
exercise of its right of petition" remains modified by the phrase "under the
constitution." See G. L. c. 231, § 59H (entire phrase is "said party's exercise of
its right of petition *under the constitution*" [emphasis added]). The legislative
intent to limit the scope of the "right of petition" in the statute is further
evidenced by the last phrase of the definition (which the dissent also overlooks):
"or any other statement falling within *constitutional protection* of the right to
petition government" (emphasis added). *Id.*

protection for petitioning activities"); *Milford Power Ltd. Partnership* v. *New England Power Co.*, 918 F. Supp. 471, 489 (D. Mass. 1996) ("the Court recognizes that the statute's definition of the 'right to petition' is very broad"). The *Milford* case is of little help to the defendant, as the court in *Milford* declined to rule on the scope of the statute and denied the motion to dismiss without prejudice. See *id.* at 489. Likewise, the *Duracraft* case does not help the defendant because there we did not construe the meaning of "right to petition," and we declined to give an expansive reading to the statute. See *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 167-168. We reasoned that an over-broad construction of the anti-SLAPP statute would compromise the nonmoving party's right to petition — the same right the statute was enacted to protect. See *id.* at 166 ("By protecting one party's exercise of its right of petition, unless it can be shown to be sham petitioning, the statute impinges on the adverse party's exercise of its right to petition . . .").

The legislative history of the anti-SLAPP statute further supports our holding. "Statutes are to be interpreted not based solely on simple, strict meaning of words, but in connection with their development and history, and with the history of the times and prior legislation." *Quincy City Hosp.* v. *Rate Setting Comm'n*, 406 Mass. 431, 443 (1990) (adopting narrower interpretation of statute based, in large part, on legislative intent as gleaned from legislative history). See *Bynes* v. *School Comm. of Boston*, 411 Mass. 264, 267-269 (1991) (determining legislative intent through examination of legislative history in conjunction with plain language of statute). The Legislature passed the anti-SLAPP statute partly in response to a lawsuit initiated by a developer against citizens of Rehoboth who signed a petition challenging proposed development out of a concern about endangering wetlands. *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 161. In enacting the statute, the Legislature expressed concern over a "disturbing increase in lawsuits brought primarily to chill the valid exercise of the *constitutional* rights of freedom of speech and petition *for the redress of grievances*" (emphasis added). Preamble to 1994 House Doc. No. 1520. See *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra*; *Stuborn Ltd. Partnership* v. *Bernstein*, 245 F. Supp. 2d 312, 314 (D. Mass.

2003) (noting that anti-SLAPP statute was designed to protect right to petition for redress of grievances). The Legislature intended the statute to encourage "full participation by persons and organizations and robust discussion of issues before legislative, judicial, and administrative bodies." Preamble to 1994 House Doc. No. 1520. *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra*. Based on this legislative history, this court concluded that "[t]he typical mischief that the legislation intended to remedy was lawsuits directed at individual citizens of modest means for speaking publicly against development projects." *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 121-122 (2002), quoting *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra*.

Although the statute was aimed primarily at protecting citizen protest in the area of land development, we recognize that the application of the anti-SLAPP statute has not been limited to this arena. See *Baker* v. *Parsons*, 434 Mass. 543, 549 (2001) ("our review of the legislative history . . . led us to conclude that the Legislature intended to go beyond the 'typical' case"). At the same time, we have recognized that the scope of the statute has its limits. See *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 162-163 ("We are dubious that the Legislature intended to create an absolute privilege. We also see no evidence that the statute was intended to reach suits such as this one between two corporate competitors involved in other ongoing litigation . . .").[10]

The legislative history reveals that the anti-SLAPP statute

---

[10]The anti-SLAPP statute was enacted as 1994 House Doc. No. 1520 and sent to Governor Weld for his signature. See 1994 House J. 1118; 1994 Senate J. 1294. Governor Weld returned the bill to the House of Representatives for amendment in order to narrow the definition of "right of petition." See 1994 House Doc. No. 5570. The Legislature rejected the Governor's recommendations, and passed the bill unamended. See 1994 House J. 1247; 1994 Senate J. 1418. Governor Weld then vetoed the legislation, arguing that the bill, as written, protected too broad a range of activities. See 1994 House Doc. No. 5604 ("The bill's proponents are concerned with retaliatory lawsuits brought by developers . . . . [However,] [e]ffectively, the bill covers any statement on a policy issue"). The Legislature passed the anti-SLAPP statute over the Governor's veto. 1994 House J. 1306. 1994 Senate J. 1491-1492.

Both the defendant and the dissent, *post* at 344-345 & n.1, cite Governor Weld's veto message and this legislative action as support for a broad interpretation of the anti-SLAPP statute. All that is revealed by this legislative history, however, is that the Governor believed that the anti-SLAPP

had its genesis as a legislative attempt to protect private citizens when exercising their constitutional right to speak out against development projects or other matters of concern to them and their communities and to seek governmental relief. "SLAPP suits [are] 'generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so.' " *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 161, quoting *Wilcox* v. *Superior Court*, 27 Cal. App. 4th 809, 816-817 (1994).[11] Nothing in the legislative history suggests any intention to protect a government-retained investigator acting on behalf of an administrative agency. The board contracted with the defendant to engage in investigative activities in aid of *the board's* case against the plaintiff,[12] and he was compensated for his services. He had no other connection to, or interest in, the allegations against the plaintiff.

The dissent, in its broad interpretation of the statute, totally disregards this legislative history. This statutory context, when combined with the Legislature's use of the phrase "petition under the constitution" as discussed above, produces an entirely different construction than that proposed by the dissent. Our opinion today does not distort the language of the statute, but rather gives it its intended meaning by taking account of these two important considerations. As is our obligation, we have given meaning to *all* of the statute's words in the context of the

statute should apply to a narrower range of communications than the Legislature did. That disagreement does not assist us in identifying where the line should be drawn. The Legislature's rejection of the Governor's position, to the extent it has meaning at all, does not illuminate the case presently before us. No more can be drawn from the legislative override of the Governor's veto than that the Legislature rejected the Governor's position.

[11]See Weld Vetoes a Bill Targeting Developers Who File Libel Suits, Boston Globe, Dec. 24, 1994, at 15 (need for anti-SLAPP legislation, as explained by bill's sponsor, is "to stop the practice of developers filing lawsuits against environmentalists and members of neighborhood groups who testify at public hearings against proposed developments"); Brewer Blasts SLAPP Suits; Barre Legislator Backs Cohen Bill, Worcester Telegram and Gazette, Dec. 29, 1993, at B4 (paraphrasing State Representative's description of SLAPP suits as those "used with increasing frequency to discourage citizens from participating in government and punishing those who do").

[12]Although the plaintiff claims that the defendant "caused the complaint to be initiated," the record does not support this assertion.

legislative history in order to effectuate the intent of the Legislature. See *Triplett* v. *Oxford,* 439 Mass. 720, 723 (2003); *Quincy City Hosp.* v. *Rate Setting Comm'n,* 406 Mass. 431, 443 (1990).[13]

The defendant argues that his enlistment by government officials to engage in petitioning activities does not disqualify him from protection under the anti-SLAPP statute. Our holding in this case does not suggest that all parties solicited by the government to participate in petitioning activities will necessarily be disqualified from the anti-SLAPP law's protections. While there is no statutory requirement that petitioning parties directly commence or initiate proceedings, in protecting those petitioning activities guaranteed under the State and Federal Constitutions, see G. L. c. 231, § 59H, the statute requires that the protected party have more than a mere contractual connection to the proceedings that are the basis of the petitioning activity. The defendant asserts no such connection to the proceedings in the case at hand.[14]

The defendant's case is distinguishable from the facts in *Baker* v. *Parsons,* 434 Mass. 543 (2001), where we affirmed the dismissal of a SLAPP suit against two defendants whose comments on a proposed development had been solicited by the government. In that case, the plaintiff landowner sought permits from State and Federal regulatory agencies to construct a pier

---

[13]The dissent has also made clear its approval of a much broader protection than that which the Legislature crafted in the anti-SLAPP statute. See *post* at 347-348, 354 ("agencies themselves are best served by having witnesses and participants of all types protected from lawsuits stemming from their testimony and participation," and "it is in the best interests of both the witnesses and the agencies that such witnesses be accorded those protections"). However, such policy rationales cannot justify disregard of the Legislature's intent. We do not decide what the Legislature should have done, but rather we must implement what it has chosen to do. See *Commonwealth* v. *Leno,* 415 Mass. 835, 841 (1993) ("Whether a statute is wise or effective is not within the province of courts").

[14]The dissent expresses concern that this distinction introduces a "new" and "amorphous" argument into the anti-SLAPP analysis, which requires courts to "pars[e] motives" regarding how and why parties came to make allegedly protected statements. See *post* at 349, 354. The dissent misconstrues today's holding. We care not whether a defendant seeking dismissal under the anti-SLAPP statute is "sincere" in his or her statements; rather, our only concern, as required by the statute, is that the person be truly "petitioning" the government in the constitutional sense.

on land he owned on an island that was also the nesting habitat for several species of aquatic birds. *Id.* at 545, 549. In the course of their review, the permitting agencies sought comment on the impact of the proposed development on the island habitat from other environmental agencies. *Id.* at 545. One of those agencies, in turn, solicited comment from Parsons, a senior scientist for an environmental group (Manomet Bird Observatory), who had studied bird populations on the island for fifteen years. *Id.* at 544-545. Her comments were based on observations she had personally made while a researcher on the island, to the effect that the plaintiff's development on the island had already "diminished and perhaps decimated a once robust and viable heronry." *Id.* at 546. She concluded her comments by calling on the responsible Federal and State regulatory agencies to halt the continued degradation of the site. *Id.* The second defendant, the Manomet Bird Observatory, was an environmental organization that had once owned the plaintiff's land, *id.* at 544-545; had used it for research, *id.* at 545; and, along with Parsons, even before the permit application was filed, had been seeking to have the area classified as an "area of critical environmental concern." *Id.* Thus, prior to the solicitation of their comments by the government, these defendants had an independent interest in the controversy and in the preservation of the land that was at the center of the dispute. They were never hired by the government, nor did they serve on behalf of the government to further its interests rather than seek redress for their grievances. These factors supported our determination that the suit against Parsons and the Manomet Bird Observatory was a " 'typical' SLAPP suit," targeting the defendants for "petition[ing] the government." *Id.* at 549 n.12.[15] Although their petitioning activity was solicited by State and Federal government officials, *id.* at 549, the defendants in *Baker* v. *Parsons, supra,* were none-

---

[15]The dissent, *post* at 352, asserts that in *Baker* v. *Parsons,* 434 Mass. 543 (2001), the court relied on the plain language of the statute in finding the anti-SLAPP statute applicable. See *id.* at 549. While we relied, in part, on the language of the statute, we also looked to the legislative history of the anti-SLAPP statute in construing that language, a consideration that the dissent completely discounts. See *id.* (*"In addition to its legislative history,* the plain language of the statute . . . squarely encompasses the facts of this case . . ."). There is thus nothing inconsistent between our analysis in *Baker* v. *Parsons, supra,* and our analysis today.

theless also engaged in constitutional petitioning activity in their own right and seeking some redress from the government based on their grievances.[16]

Because we hold that this case is beyond the anti-SLAPP statute's reach, we need not resolve the parties' dispute whether the defendant's affidavit contained the requisite factual basis to support dismissal pursuant to the anti-SLAPP statute. See G. L. c. 231, § 59H; *Baker* v. *Parsons, supra* at 551-552, 553-554.

2. *Applicability of qualified immunity pursuant to G. L. c. 112, § 5.* General Laws c. 112, § 5, which grants the board authority to investigate and prosecute disciplinary complaints against licensed physicians, also provides qualified immunity for those who participate in board investigations of physician misconduct. The immunity provision reads:

> "No person filing a complaint or reporting or providing information pursuant to this section or assisting the board at its request in any manner in discharging its duties and functions shall be liable in any cause of action arising out of the receiving of such information or assistance, provided the person making the complaint or reporting or providing such information or assistance does so in good faith and without malice."

*Id.* The defendant claimed qualified immunity pursuant to G. L. c. 112, § 5, in his special motion to dismiss. The judge, having dismissed the case based on the anti-SLAPP statute, did not reach the issue. We address it briefly.

The parties, relying on various canons of statutory interpretation, ask this court to decide whether the anti-SLAPP statute or G. L. c. 112, § 5, is "controlling." This question is based on a fundamental misunderstanding of the two statutes. Neither statute "controls" because there is no relationship between the two. The anti-SLAPP statute and G. L. c. 112, § 5, address different situations and thus represent two separate and independent

---

[16]Similarly, the defendant's activities are distinguishable from those of a government "whistleblower," who petitions a government body regarding activities or actions based on personal knowledge and concern. We do not address whether a whistleblower would be protected under the anti-SLAPP statute.

defenses potentially available in proceedings of this nature. As discussed above, the anti-SLAPP statute applies to parties exercising their "right of petition under the constitution." Nothing in G. L. c. 112, § 5, either enlarges or restricts this protection.

Where, as in the present case, the defendant files a special motion to dismiss pursuant to the anti-SLAPP statute and also asserts qualified immunity as an alternative basis for dismissal, the judge first should decide, as he did here, whether to grant the special motion to dismiss. See, e.g., *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 168 (1998) (affirming denial of special motion to dismiss and remanding for further proceedings on other potential bases of immunity). This sequence is dictated by the anti-SLAPP statute, which automatically stays discovery (subject to certain exceptions) and directs the judge to consider the merits of the special motion to dismiss on an expedited basis. See G. L. c. 231, § 59H ("court shall advance any such special motion so that it may be heard and determined as expeditiously as possible" and "[a]ll discovery proceedings shall be stayed upon the filing of the special motion . . . provided, however, that the court, on motion and after a hearing and for good cause shown, may order that specified discovery be conducted"). If the anti-SLAPP statute applies, the case will be dismissed without any consideration of qualified immunity. It is only when the special motion is denied that the judge shall consider the issue of qualified immunity as an independent basis for dismissal. For a judge to proceed otherwise would frustrate the procedural design of the special motion and the intent of the Legislature. See preamble to 1994 House Doc. No. 1520 (statute designed by Legislature to ensure SLAPP suits will be "resolved quickly with minimum cost"). See also *Fabre* v. *Walton*, 436 Mass. 517, 521-522 (2002), *S.C.*, 441 Mass. 9 (2004) ("protections afforded by the anti-SLAPP statute . . . are in large measure lost if the petitioner is forced to litigate a case to its conclusion before obtaining a definitive judgment through the appellate process").

Because the anti-SLAPP motion was improperly allowed here, we consider the application of G. L. c. 112, § 5, to this case. The plain language of the statute applies to the defendant's

statements to the board and neither party directly contends otherwise. The relevant inquiry on remand is, therefore, whether the defendant's conclusions were made "in good faith and without malice." G. L. c. 112, § 5.[17]

For the foregoing reasons, we vacate the dismissal of the plaintiff's complaint and remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

SOSMAN, J. (dissenting, with whom Marshall, C.J., joins). If the Legislature had not provided its own definition of "a party's exercise of its right of petition," G. L. c. 231, § 59H, the various limitations on that term imposed by today's decision might represent a plausible interpretation of the statute. We are not, however, called on to craft our own definition, or to interpret the statute based on our own understanding of what a party's "exercise of its right of petition" ought to entail, because the Legislature has defined the term for us. The statute provides that "a party's exercise of its right of petition" means, inter alia, "any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding." *Id.* Here, the claims against Gastfriend are expressly based on Gastfriend's having submitted a "written . . . statement," in the form of an affidavit, to an "executive . . . body," the Board of Registration in Medicine (board), see G. L. c. 13, § 10, in connection with a "proceeding," a disciplinary proceeding against Kobrin. The conduct for which Gastfriend has been sued thus comes within the literal

---

[17]The defendant asserts in addition that he has absolute immunity under the common law and that the complaint should have been dismissed for that reason. The dissent focuses extensively on the application of absolute common-law immunity for witnesses, apparently hoping to transfer such immunity to the anti-SLAPP context, where it does not apply. See *post* at 345-347. That the common law may provide a witness with absolute immunity says nothing at all about whether the Legislature intended to grant a lesser form of immunity to the defendant under the anti-SLAPP statute. Our examination of the legislative history revealed nothing that would suggest the Legislature looked to common-law witness immunity in crafting the anti-SLAPP statute.

meaning of the term "a party's exercise of its right of petition," as that term is defined in the statute.

The court today sidesteps this straightforward application of the statutory definition by emphasizing the words "its right" in the term "a party's exercise of its right of petition," and claims that the protections of § 59H must be limited in order not to render those words "superfluous." *Ante* at 332-333. However, the statute provides us with the Legislature's definition of the entire term "a party's exercise of its right of petition." We should look to that definition, not our own assessment of what the words "its right" might connote, if we did not have a definition from the Legislature. The definition itself unambiguously applies to the present case, and no component of the definition is rendered "superfluous" by that application. Apparently discomfited by the broad scope of the definition (for fear that it would protect "every statement ever made to a government body," *ante* at 333), the court ignores the definition and reads its own limitation into the words being defined. The court then seeks to justify that limitation by suggesting, without citation to any authority, that one's constitutional right of petition is limited to petitioning on one's "own" behalf in pursuit of one's "own interests," and that the additional phrase "under the constitution" therefore connotes the Legislature's desire to limit the protections of § 59H in the same fashion. See *ante* at 330, 332-334.

"[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. . . . When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' " (Citations omitted.) *Connecticut Nat'l Bank* v. *Germain*, 503 U.S. 249, 253-254 (1992), quoting *Rubin* v. *United States*, 449 U.S. 424, 430 (1981). "Courts are not free to read unwarranted meanings into an unambiguous statute even to support a supposedly desirable policy not effectuated by the act as written." 2A N.J. Singer, Sutherland Statutory Construction § 46:1, at 129 (6th ed. 2000).

There are, of course, occasions when we depart from the literal wording of a statute, despite the unambiguous nature of

that literal wording. However, such departures from the Legislature's straightforward wording are rare, reserved for those instances where application of the literal meaning would result in "absurd or unreasonable" consequences, *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996), quoting *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982), or would "defeat [the] purpose" of the legislation, *Champigny* v. *Commonwealth, supra,* quoting *Lehan* v. *North Main St. Garage,* 212 Mass. 547, 550 (1942). We should be especially leery of narrowing the literal meaning of this particular definition, as the breadth of the definition was repeatedly criticized by the Governor at the time the statute was being enacted, and the Legislature deliberately chose to reject that criticism and to maintain the definition in its extremely broad form.[1]

Today's opinion acknowledges that history, but concludes that it stands for nothing more than the fact that "the Legislature rejected the Governor's position." *Ante* at 337 n.11. What this history signifies is that the Legislature's attention was drawn to the fact that the statute's definitions were very broad indeed, and that they went well beyond the prototypical SLAPP suit. The Legislature's decision to keep the statute's broad definitions in the face of the Governor's repeated objections indicates at a minimum that the breadth of those definitions was not the product of inartful draftsmanship or legislative inadvertence. Given the attention that was paid to the definitions at the time of enactment, we should be even more inclined to interpret the definitions consistent with their literal wording — their breadth

---

[1]Specifically, when the first enactment of the bill was sent to the Governor, he vetoed it, explaining that the bill as drafted "applies to a broad group of potential claims, sweeping in cases that are far beyond the types of lawsuits which the bill's proponents wish to control," and noting the stringent consequences for any claim "falling within its broad definition." Letter from Governor William F. Weld to House of Representatives and Senate (Jan. 13, 1994). When the Legislature passed another bill using the same "broad definition" (see 1994 House J. 1118; 1994 Senate J. 1294), the Governor again articulated his concern about the ostensible overbreadth of the bill and recommended an amendment to narrow its scope. 1994 House Doc. 5570. When the bill passed again without amendment (see 1994 House J. 1247; 1994 Senate J. 1418), the Governor again expressed the view that it was too broad and, for that reason, vetoed it. See 1994 House Doc. No. 5604. The Legislature proceeded to override the Governor's veto. 1994 House J. 1306; 1994 Senate J. 1491-1492.

is not some drafting error that we need to correct to make the statute comport with the Legislature's ostensible intent.

Today's opinion makes no claim that according the protections of G. L. c. 231, § 59H, to this particular defendant would result in "absurd or unreasonable" consequences, or that doing so would "defeat the purpose" of § 59H. *Champigny* v. *Commonwealth, supra.* Rather, the court takes it upon itself to narrow the protections of § 59H to a smaller class of persons that the court finds to be more deserving than expert witnesses who are paid by the government, rather than accept the literal statutory mandate that such protections are to be accorded to all persons — paid or unpaid, expert or lay, private or officially retained — submitting "written or oral statement[s]" to governmental bodies in connection with pending proceedings. Before tampering with the Legislature's definition of "a party's exercise of its right of petition," we should consider whether it would be "absurd or unreasonable" to protect all such persons.

There is nothing "absurd or unreasonable" about protecting all witnesses from lawsuits based on the statements they give during the course of agency proceedings. To the contrary, absolute immunity from suit has long been accorded to witnesses in judicial proceedings, even if their testimony is knowingly false. See *Correllas* v. *Viveiros*, 410 Mass. 314, 319-320 (1991); *Aborn* v. *Lipson*, 357 Mass. 71, 72-73 (1970); *Mezullo* v. *Maletz*, 331 Mass. 233, 236-237 (1954); *Sheppard* v. *Bryant*, 191 Mass. 591, 592 (1906); *Hoar* v. *Wood*, 3 Met. 193, 197 (1841). The privilege is grounded in the view that "it is more important that witnesses be free from fear of civil liability for what they say than that a person who has been defamed by their testimony have a remedy." *Aborn* v. *Lipson, supra* at 72. Massachusetts law recognizing such absolute immunity accords with well-established law across the country. See *Briscoe* v. *LaHue*, 460 U.S. 325, 330-334 (1983), and cases cited; *Blevins* v. *Ford*, 572 F.2d 1336, 1338 (9th Cir. 1978); *Brawer* v. *Horowitz*, 535 F.2d 830, 836-837 (3d Cir. 1976); *Sacks* v. *Stecker*, 60 F.2d 73, 75 (2d Cir. 1932) (absolute immunity for witnesses "is the practically universal rule in this country"). This immunity is accorded not merely for statements made as part of a witness's testimony at trial, but for statements made "in the context of a

proposed judicial proceeding." *Correllas* v. *Viveiros, supra* at 321. See *Dolan* v. *Von Zweck,* 19 Mass. App. Ct. 1032, 1033 (1985), quoting *Sullivan* v. *Birmingham,* 11 Mass. App. Ct. 359, 361 (1981) ("absolute privilege applies to defamatory statements made 'in the institution or conduct of litigation or in conferences and other communications preliminary to litigation' "); *Frazier* v. *Bailey,* 957 F.2d 920, 932 (1st Cir. 1992); *Leavitt* v. *Bickerton,* 855 F. Supp. 455, 458 (D. Mass. 1994); Restatement (Second) of Torts § 588 (1977) ("A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding"). This absolute privilege applies not only to oral testimony in court, but also to statements or testimony given in written form. See *Mezullo* v. *Maletz, supra* (absolute privilege protected physician who signed certificate in commitment proceeding certifying that plaintiff was insane); *King* v. *Hildebrandt,* 331 F.2d 476, 478 (2d Cir. 1964) (immunity accorded psychiatrist who signed affidavit that launched commitment proceeding, noting "well-established rule that statements in pleadings and affidavits made in the course of judicial proceedings are absolutely privileged so long as they are relevant to the issues involved in the proceeding"); *Williams* v. *Williams,* 169 F. Supp. 860, 862 (D.D.C. 1958) (statement in affidavit); *Todd* v. *Cox,* 20 Ariz. App. 347, 348 (1973) (affidavit); *Overman* v. *Klein,* 103 Idaho 795, 800 (1982) (immunity applicable to witness who filed affidavit in child custody proceeding, noting that witness immunity extended "as to virtually any statement in documents which have been filed in a judicial proceeding"); *Resciniti* v. *Padilla,* 72 A.D.2d 557, 558 (N.Y. 1979) (affidavit); *Jarman* v. *Offutt,* 239 N.C. 468, 472 (1954) (affidavit); *Vieira* v. *Meredith,* 84 R.I. 299, 301 (1956) (statement in pleadings).

Finally, of particular relevance to the distinction that today's decision reads into § 59H, common-law immunity from suit extends to witnesses who are employed by or working for the government — it is not limited to private persons giving evidence in such proceedings. See *Briscoe* v. *LaHue, supra* at 335-336 & n.15 (common law provided absolute immunity for

all witnesses, "governmental or otherwise," and "drew no distinction between public officials and private citizens"; 42 U.S.C. § 1983 did not override witness immunity for police officers who allegedly testified falsely); *Overman* v. *Klein, supra* (witness immunity extended to social worker employed by government agency). See also *LaLonde* v. *Eissner*, 405 Mass. 207, 211-212 (1989) (absolute immunity for court-appointed experts). Indeed, "to the extent that traditional reasons for witness immunity are less applicable to governmental witnesses, other considerations of public policy support absolute immunity more emphatically for such persons than for ordinary witnesses." *Briscoe* v. *LaHue, supra* at 342-343.

From this vast body of precedent supporting absolute immunity for statements made by any kind of witness in connection with judicial proceedings, the anti-SLAPP statute takes the modest step of extending a more limited degree of immunity to all persons submitting statements in connection with other types of governmental proceedings. There is nothing remarkable, let alone "absurd or unreasonable," about protecting all persons who provide government agencies with information in the course of agency adjudications, including those who have been sought out and paid by the government. What is being protected is not merely the "rights" of the person submitting such information, but the interests of the government agency in acquiring information germane to the proceedings before it. See preamble to 1994 House Doc. No. 1520 (purposes of anti-SLAPP legislation include encouragement of "robust discussion of issues before legislative, judicial, and administrative bodies"). As with immunity from suit for a witness's participation in judicial proceedings, immunity for witnesses in agency proceedings removes what might otherwise be a powerful disincentive against participation, a disincentive that would operate to rob the agency itself of the benefit of those witnesses' information, views, and expertise.[2] The agencies themselves are best served by having witnesses and participants

---

[2]The amicus brief of the Attorney General points out that the Board of Registration in Medicine (board), like many other government agencies, regularly needs the assistance of outside experts in order to perform its functions.

of all types protected from lawsuits stemming from their testimony and participation. Indeed, that such agencies are the functional equivalent of courts, requiring comparable protection for those involved, has long been recognized. See *Butz* v. *Economou*, 438 U.S. 478, 512-517 (1978) (absolute immunity accorded to administrative law judges and to agency attorneys presenting case, as they are equivalent of court judges and prosecutors); *Bettencourt* v. *Board of Registration in Med.*, 904 F.2d 772, 782-785 (1st Cir. 1990) (absolute immunity for board and staff members in connection with disciplinary proceedings against physician).

Whereas the common law made witnesses in judicial proceedings absolutely immune from suit, the anti-SLAPP statute, protecting persons making statements in connection with government proceedings, extends a form of protection that is slightly less than absolute immunity. Under G. L. c. 231, § 59H, the suit against the person who made the statement will be dismissed unless it can be shown that the person's statement "was devoid of any reasonable factual support or any arguable basis in law," the burden being on the plaintiff to demonstrate that the participant's statement lacked such support or basis. The statute also establishes a procedural mechanism to enforce this immunity in a pragmatic way at the outset, before the defendant has been subjected to the expense and anxiety of protracted litigation. See *Fabre* v. *Walton*, 436 Mass. 517, 520-522 (2002), *S.C.*, 441 Mass. 9 (2004) (allowing interlocutory appeal from denial of motion to dismiss under § 59H). Extending such protection to persons who submit information to government agencies, whether they do so on their own personal initiative or as witnesses retained by the government, is an extremely modest extension of the law of witness immunity.[3] It is hardly "absurd or unreasonable" to include all such persons

---

[3]With specific reference to the board, it is also an extremely modest modification of the earlier statute that gave qualified immunity to persons filing complaints, reporting or providing information, "or assisting the board at its request in any manner in discharging its duties and functions." G. L. c. 112, § 5. That statute precludes imposition of liability as long as the person complaining, reporting, or assisting did so "in good faith and without malice." *Id.* The anti-SLAPP statute substitutes a more stringent qualification of the immunity that is granted, i.e., the immunity is lost only if the person's state-

within the scope of this protection, and I therefore see no reason to depart from the literal language of § 59H and carve out an exception merely because the witness's participation was not in pursuit of "a grievance of his own" or "on his own behalf." *Ante* at 330.

Beyond the troubling ramifications today's decision has for government agencies seeking to obtain opinions from private experts, the case introduces a new and somewhat amorphous argument with which to defeat special motions to dismiss under § 59H, namely, the argument that the defendant who made the statement to a government agency did not have his or her "own interests" at stake, was not acting on his or her "own behalf," or lacked the requisite "interest in" the subject of the proceedings. See *ante* at 330, 332, 334, 337. Even where the suit in question is unabashedly based on a person's "statement" to a government agency in connection with a pending matter, the motives and relationships underlying the person's decision to give such a statement must apparently be examined to make sure they are sufficiently pure to come within the ambit of the narrower version of § 59H outlined in today's decision.

While the precise contours of this evaluation of what caused the person to submit a statement to the government agency are unclear, it is apparent that affiliation with the government, or the receipt of filthy lucre, or perhaps a combination of the two, may suffice to taint the person making the statement, such that the person is no longer acting in his or her "status as citizen[]"

---

ment "was devoid of any reasonable factual support or any arguable basis in law." G. L. c. 231, § 59H. And, to give teeth to that immunity, the anti-SLAPP statute makes available a procedural vehicle ensuring that the immunity issue will be addressed promptly. Given that the Legislature had already extended some degree of immunity to persons "assisting the board," it cannot be "absurd or unreasonable" for the Legislature to tighten that immunity somewhat, create procedures to enforce it, and extend it to all persons who are "assisting" government agencies by giving "oral or written statement[s]" to those agencies.

Today's decision correctly holds that, notwithstanding G. L. c. 112, § 5, persons exercising their "right of petition" before the board are entitled to the protections of G. L. c. 231, § 59H. *Ante* at 340-341. That this defendant would also be covered under G. L. c. 112, § 5, does not preclude him from claiming the more rigorous protections of the anti-SLAPP statute if the suit against him is "based on" his having made a "statement" to the board. G. L. c. 231, § 59H.

or exercising a "constitutional" right and should therefore be deprived of the quasi immunity and procedural protections of § 59H. *Ante* at 332, 334-335, 338. The court today posits that there may be persons who are "solicited by the government" to participate in proceedings, but who nevertheless could be protected by § 59H, as long as that solicitation did not result in "performing services for the government" or "a mere contractual connection to the proceedings." *Ante* at 332, 338.[4] The court cites no authority for the proposition that either receipt of compensation for one's time or agreement to provide the government with information or expert advice deprives someone of the "status" of "citizen" or otherwise curtails someone's "constitutional" rights. Yet, according to today's opinion, such persons are not deserving of protection and must therefore somehow be excluded from the unambiguous definition of § 59H. Recognizing the ambiguity inherent in its own (as opposed to the Legislature's) definition, the court acknowledges that "some difficult factual situations will have to be assessed on a case-by-case basis." *Ante* at 332 n.8. The court then muses whether § 59H would be available to "a government 'whistleblower,' " apparently torn between the fact that a whistleblower may have "personal knowledge and concern" about the matter being reported and the fact that such a whistleblower, working for the government, might just be pursuing the government's interest. *Ante* at 340 n.16.

Today's decision casts a pall of uncertainty over the status of many persons who make statements to the government. What if an expert is hired by a petitioner — will the petitioner's "own interests" in the matter allow us to extend the protections of

---

[4]This suggests that retained expert witnesses, who are compensated for their time, will not be protected, unless perhaps they can show that they had some interest in or connection to the matter prior to entering that contractual arrangement. Ordinarily, when seeking an expert's opinion, one purposely seeks out an expert who does *not* have some prior involvement or interest in the matter, as that deliberate detachment is viewed as important to the neutrality and validity of the resulting expert opinion. Under today's ruling, biased experts who are compensated by agencies can perhaps claim the protection of § 59H when they are sued for rendering faulty opinions, because they can demonstrate that they had their "own" interest in the outcome of the matter before they were retained. However, neutral experts — the only kind of experts worth hiring — cannot claim that protection.

§ 59H to the petitioner's disinterested expert, *ante* at 334, or does the fact that the individual expert has no "grievance of his own," *ante* at 330, deprive the expert of those protections? What about lobbyists or lawyers? They are customarily making statements to government officials on behalf of their clients, not on their own behalf, and are compensated for doing so. Is their connection to the proceeding also a "mere contractual connection" that deprives them of protection? See *ante* at 338. What about persons who testify before agencies after being subpoenaed (by either the agency or by any of the parties) — such persons submit "statement[s]" in connection with the agency proceeding, but if they did not want to make statements of their own volition, are they pursuing their "own" grievances, or exercising their "right of petition under the constitution"? See *ante* at 330.

In my view, such questions are irrelevant, as the straightforward definition provided by the Legislature does not require us to consider who the person making the statement works for, whether the statement was a product of the declarant's "own interests," *ante* at 334, or what other constellation of factors may have influenced the person to submit a statement to the agency. The definition of "a party's exercise of its right of petition" contains no reference to the motives or affiliations of the person making the "statement . . . to a legislative, executive, or judicial body," and special motions to dismiss under § 59H should not be bogged down by such considerations.

The elusive nature of the additional element that the court has inserted into § 59H is best illustrated by the difficulty the court has in conjuring some distinction between the present case and *Baker* v. *Parsons*, 434 Mass. 543 (2001). There, as here, a government agency solicited the views of an outside expert in order to assist the agency, and that expert was then sued for the statements she had made in rendering her opinion.[5] There, as here, the plaintiff argued that the anti-SLAPP statute

---

[5]More specifically, the United States Army Corps of Engineers had itself solicited comment from other government agencies, including a unit within the Massachusetts division of fisheries and wildlife (division), with respect to a pending application to construct a pier on an island. The division, in preparation for its own response to the Federal agency, in turn sought input from *Parsons,* a scientist who had conducted research on the island where the

was not applicable. Rather than engage in any analysis of the expert's "independent interest in the controversy" that predated the government's solicitation of her input, *ante* at 339, the court in *Baker* reasoned that "the plain language of the statute . . . squarely encompasses the facts of this case." *Baker* v. *Parsons*, *supra* at 549. The case came within that "plain language" because "Parsons, a biologist, responded to inquiries from State and Federal environmental officials, in connection with government agency reviews of Baker's application to develop property by constructing a pier on an island that has historically been a home for many aquatic birds. As a result of her responses, Baker eventually sued Parsons and the nonprofit organization for which she works, thus, according to the defendants, 'chilling' any further participation by the defendants in assisting State and Federal agencies gathering information on the merits of Baker's application." *Id.* That same "plain language" analysis can be applied to the present case using the exact same reasoning: Gastfriend, a physician, responded to inquiries from the board, in connection with the board's review of Kobrin's fitness to practice medicine. As a result of his responses, Kobrin eventually sued Gastfriend, thus, according to the defendant, "chilling" any further participation by him in assisting the government in any proceeding against Kobrin.[6]

In attempting to craft some distinction between Gastfriend's

proposed pier would be located. Parsons provided her written opinion, opining that the value of the island as a nesting habitat for aquatic birds made it an inappropriate site for the pier. That opinion allegedly caused others (not Parsons herself) to petition the Executive Office of Environmental Affairs for an environmental impact review of the proposed pier. Baker, the applicant seeking permission to construct the pier, then sued Parsons for the damages allegedly incurred as a result of the delay in issuance of the permit for the pier. *Baker* v. *Parsons*, 434 Mass. 543, 545-546 & n.6 (2001).

[6]Inexplicably, today's decision treats as irrelevant the fact that Gastfriend was a potential witness in a pending criminal case against Kobrin at the time Kobrin filed this lawsuit. *Ante* at 330 n.5. Gastfriend would not view the pendency of this lawsuit as irrelevant to his consideration whether he would be willing to assist the prosecutor, nor would it be viewed as irrelevant by the prosecutor, who would have to consider whether the lawsuit would make Gastfriend appear biased. Of course, whether the lawsuit was intended to "chill" Gastfriend's participation in either the disciplinary proceedings or the criminal prosecution, the effect of today's decision will unquestionably "chill" any neutral expert's willingness to provide an opinion to any State or Federal agency.

status in the present case and Parsons's status in *Baker* v. *Parsons*, *supra*, the court claims that Gastfriend was "serv[ing] on behalf of the government to further its interests," whereas Parsons was "seek[ing] redress for [her] grievances." *Ante* at 339. That Parsons was pursuing her "own" grievance was demonstrated by the fact that she had "personally" conducted research on the island site at issue, and thereby had an "interest" in the preservation of the island that was formed "prior to the solicitation of [her] comments by the government." *Id.* Gastfriend, by comparison, only articulated his views after he was "hired by the government." *Id.*

This proffered distinction between Parsons and Gastfriend assumes that an expert who starts out as a neutral, disinterested expert solicited (and paid) by an agency cannot thereafter become a genuine petitioner who, having become familiar with the facts and circumstances, develops his "own" desire to see the government take a particular action. To the extent that it was Parsons's sincere view about the undesirability of the proposed pier construction that made her a viable candidate for protection under § 59H, how can we tell that, by the time he submitted his affidavit, Gastfriend was not equally sincere in his view that Kobrin should not be allowed to practice medicine? May not an initially neutral physician, who starts out with no knowledge of the physician being disciplined, review the information made available to him and then become indignant at what he views as dangerously substandard medical practice, and thus intensely desirous that the offending physician's license be revoked? While Gastfriend did not have such views at the time the board first contacted him, because he at that time knew nothing of Kobrin or the deaths of his patients (that ignorance, in the court's view, being a feature that makes him distinguishable from Parsons, *ante* at 338), who is to say that he had not developed an "interest" in the outcome of the matter by the time he submitted his affidavit? Having learned about Kobrin's practice, may not Gastfriend have developed his "own" concern for the image of his profession, or his "own" compassion for patients who were, in his opinion, at risk of dying from Kobrin's improper practices, and thus have his "own" interest in seeing Kobrin's license suspended? If he had

developed the requisite desire that the government take action against Kobrin, why would his agreement to review the records and render an opinion diminish his "constitutional" right as a "citizen" to express his views to the governmental body that had the power to suspend Kobrin's license? The court today cynically assumes that Gastfriend, having begun as a "hired gun," would forever be a "hired gun" and would not actually care about the outcome of the disciplinary proceedings against Kobrin, whereas Parsons, because she had already studied the island habitat in question, subconsciously cared about the outcome of the pier permit proceedings before she even knew about them. There is nothing in this record to suggest that, at the time he submitted his affidavit, Gastfriend actually had no preference as to what the board did with Kobrin's license. Indeed, it is insulting to suggest that, for money, Gastfriend was simply saying whatever "the board" or "the government" wanted him to say, and thus merely acting "on behalf of the board" or "the government." See *ante* at 333, 339. If, as today's decision states, § 59H will not apply if the person making the statement to the governmental body lacks some "interest" in the matter, there is no basis on which to conclude that Gastfriend ultimately lacked such an "interest" in the matter before the board.

I see nothing to be gained, and much to be lost, in requiring such parsing of motives as part of a special motion to dismiss under § 59H. In my view, nothing in § 59H suggests that its protections hinge on the manner in which the person making the statement came to know or care about the agency proceedings in question. Only by reading such irrelevant considerations into the statute, and then assuming that Gastfriend cannot satisfy those irrelevant considerations, does the court deny him the protections of § 59H. Gastfriend, and the many other expert witnesses who assist a wide array of government agencies, are entitled to those protections under the unambiguous wording of the statute's definition, and it is in the best interests of both the witnesses and the agencies that such witnesses be accorded those protections in the prompt manner that § 59H envisions. I see no indication that the Legislature intended to deny such witnesses those protections, and therefore respectfully dissent.